

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------x
                            :
UNITED STATES OF AMERICA         :    CVB NOS. 1977562, 1977563,
                            :    1977564,1977565
v.                              :
                            :
MARK COLVILLE, MEGAN FOUNTAIN,  :
ASHLEY JORDAN SCRUGGS &      :
GREGORY WILLIAMS           :    DATE: OCTOBER 18, 2013
-------------------------------------------------x

## MEMORANDUM OF DECISION

A petty offense trial was held before this Magistrate Judge on October 7, 2013; Special Agent Glenn VanNeil and Inspector Felipe Amaro, both employees of the Federal Protective Services ["FPS"], which is part of the Department of Homeland Security, testified for the Government, and the four defendants, who have represented themselves on a pro se basis, all testified. Seven exhibits were admitted for the Government: four photographs (Exhs. 1-4), a CD with six videos (Exh. 5),[1] copy of a letter (Exh. 6), and copy of the Violation Notices (Exh. 7); defendants admitted one exhibit, a statement from defendant Scruggs (Exh. A).

## I. FINDINGS OF FACT

All six witnesses agreed that on the morning of February 21, 2013, a large number of individuals were protesting in a "peaceful" and "non-violent" manner on

---

[1]The six videos, which have no sound, are: "Public Entrance 2," running from 12:26 p.m. to 1:19 p.m.; "X-Ray Overhead Foyer," running from 12:27 p.m. to 1:19 p.m.; "Employee/Public Exit," running from 12:27 p.m. to 1:19 p.m.; "Employee ID Entrance," running from 12:27 p.m. to 1:19 p.m.; "Plaza Left Ext," running from 12:30 p.m. to 1:19 p.m.; and "Plaza Right Ext," running from 12:26 p.m. to 1:19 p.m.

Unless otherwise indicated, when reference is made to Exh. 5, then all six videos support that factual finding.

The Magistrate Judge has viewed all six videos in their entirety.

the sidewalk in front of the Abraham Ribicoff United States Courthouse, located at 450 Main Street, Hartford, Connecticut. (See also Exh. 5 (X-Ray Overhead Foyer)). The estimates of the crowd size range from more than fifty people, as testified to by Amaro, to more than eighty, as testified to by defendant Fountain, and to one hundred individuals, as testified to by VanNeil. The group had assembled to show its strong support for JoséMaria Islas, whose final deportation hearing was scheduled that day in the building. (Exh. 6; Exh. A). Among the protesters were the four defendants here, who are either employees of, or committed volunteers for, social service organizations in New Haven that focus on the significant obstacles facing immigrant families, including immigration issues. As Amaro testified, this federal building houses not only the federal judges and their chambers and courtrooms, but also the Clerk's Office, the U.S. Attorney's Office, the U.S. Marshals, the Bureau of Alcohol, Firearms and Tobacco, and the U.S. Department of Immigration and Customs Enforcement, among others.   VanNeil testified that it is "quite common" to have protesters on this sidewalk, and the building "averages one [protest] a week."  Both VanNeil and Amaro were working the 8:00 a.m. to 5:00 p.m. shift for FPS that day.

Facing the Ribicoff Building from Main Street, there are two sets of doorways from the street into the building, the main doors on the right for the general public, to which a very wide sidewalk leads, and the employee doors on the left, accessible through a narrower sidewalk that is perpendicular to the main sidewalk; as VanNeil and Amaro testified, the employee doors are also used as exit doors for the public, especially in emergency circumstances.  (Exh. 2; see also Exh. 1 (view from inside lobby of Ribicoff Building looking toward Main Street; Exh. 5).  As VanNeil explained,

2

the security screening for the public generally occurs through the set of doors on the right, and as Amaro explained, there is an ID check point at the employee entrance. (See Exhs. 1, 5 (X-Ray Overhead Foyer, Employee/Public Exit, Employee ID Entrance)).

VanNeil testified that he had heard a radio transmission regarding the protests outside, at which point he, Amaro, and Inspector Kusnierz, another FPS Inspector, left the FPS Office and headed to the lobby of the Ribicoff Building. Upon walking through the lobby of the building, he noticed two individuals (defendants Williams and Scruggs) sitting on the ground, each with their backs against the doors for the employee entrance/public and emergency exit. (Exhs. 2-3, 5 (Employee ID Entrance, Plaza Left Ext, Plaza Right Ext)). VanNeil testified that he "allowed them to sit there for a few minutes," because he believed (erroneously it turns out) that the other set of doors for the public entrance were "still accessible." Amaro testified that there was "no way for the public to enter or exit the building" through the employee doors, which serve as emergency doors. Defendant Scruggs testified that she sat blocking the doors for only two to three minutes. While he was still inside, through the glass doors, VanNeil requested that defendants Williams and Scruggs move away from the door, in response to which they "backed firmer against the doors," according to VanNeil. VanNeil, Amaro and Kusnierz then pushed the doors open, and VanNeil thereupon placed defendant Scruggs away from the door and put her in handcuffs, while Amaro arrested defendant Williams. Amaro's testimony was similar to that of VanNeil. Both FPS officers' testimony is supported by the video of this event. (Exh. 5 (Employee ID Entrance, Plaza Left Ext, Plaza Right Ext)). Defendant Williams

3

testified that the FPS officers were "initially not polite" and he believes that they pushed hard on the doors to harm Scruggs and him.

VanNeil testified that he utilized "normal" techniques in effectuating this arrest, and neither defendant indicated that they were experiencing any pain. VanNeil brought defendant Scruggs inside the building to the Security Office and obtained identification from her; he agreed that she offered "no resistance" to the process. Amaro testified that he escorted defendant Williams to the Security Office.

VanNeil and Amaro both testified that upon returning to the front of the lobby, they noticed that the employee entrance was cleared, but that there were two additional people (defendants Colville and Fountain) sitting against the general entrance; as Amaro further testified, defendants Colville and Fountain stood up, walked toward the other doors, and seated themselves near the employee entrance, with two security officers standing next to them to block them from advancing toward the doors.  (Exhs. 2, 4, 5).  VanNeil testified that he instructed defendant Fountain to stand up, or else "she risked arrest."  Upon cross-examination, defendant Fountain agreed that the FPS Officers had asked defendant Colville and her to leave voluntarily, but they did not.   Amaro testified that these two defendants then "scooted over" on their bottoms or knees towards the doors. (Exh. 5 (X-Ray Overhead Foyer, Employee/Public Exit, Employee ID Entrance, Plaza Left Ext, Plaza Right Ext)). Amaro testified that defendants Colville and Fountain had been warned three times to stand up.  When defendant Fountain failed to comply, having indicated to VanNeil that she "wanted" to be arrested, he put her under arrest.  Defendant Fountain testified that she had informed VanNeil that she was "willing" to be arrested like

4

immigrants have been, not that she "wanted" to be arrested.   Upon cross-examination, VanNeil agreed that once defendant Fountain was arrested, there was adequate space for someone to walk by her to enter or exit the Ribicoff Building. VanNeil escorted her to the Security Office to join defendants Williams and Scruggs; VanNeil described defendant Fountain as "cooperative." Defendant Colville testified that the FPS Officers were "very respectful," and his "decision [to permit himself to be arrested] was not taken lightly."  Defendant Colville further testified that although the group's actions were "not harmful to anyone," he did acknowledge that blocking the doors "could be construed as a disruption."  Defendant Fountain denied that she had blocked any people by merely sitting in front of the door.

Amaro, Scruggs, Williams, and Colville all agreed that there was at least one member of the public, himself an immigrant to this country, who was unable to enter the public entrance to the Ribicoff Building during this time period.  (Exh. 5 (Employee ID Entrance, Plaza Left Ext, Plaza Right Ext)). Although defendants Scruggs and Williams testified that this man was eventually able to enter the building after "the demonstration was over," defendant Colville testified that this gentleman was "visibly frustrated," so that Colville offered to let him through.  (See also Exh. 5 (Employee ID Entrance)).  Although he does not remember the names of the federal employees with whom he spoke, defendant Williams testified that none of them expressed any concern over the slight delay.  Defendant Colville similarly testified that the federal employees and members of the public who could not enter the building were "supportive and understanding," although "some" expressed frustration over not being able to enter the building immediately.  Upon cross-examination,

defendant Colville also acknowledged that he did not know the number of people inside the Ribicoff Building who were unable to exit, and he recalled having apologized to people for the "inconvenience." Amaro testified that there was a period of time when all four front doors to the Ribicoff Building had been blocked.

VanNeil testified that when he returned to the FPS Office, he ran the defendants' names through National Crime Information Center ["NCIC"] to determine whether they had previous criminal records. After consultation with the U.S. Marshals, VanNeil decided that the defendants would be issued Violation Notices, instead of initiating formal criminal charges against them through arrest warrants. Amaro thereafter prepared the four Violation Notices. (Exh. 7). Amaro testified that "at least a half dozen times," he asked the four defendants if they needed medical attention, and none asked for any help. The four defendants were then released, after having been informed that the only penalty they faced was a fine.

Amaro testified that he then returned to the front of the Ribicoff Building, and found that neither set of doors was blocked. At the location where defendant Williams had been seated, Amaro found a position paper that had been signed by Scruggs and Williams, addressed to "Theo." (Exh. 6).

VanNeil testified that federal employees and members of the public had been "inconvenienced," as they were unable to enter or exit from the Ribicoff Building due to the actions of the defendants. Upon cross-examination, VanNeil agreed that while there had been chanting by the protestors on the street, the four defendants were quiet while they were sitting on the ground in front of the Ribicoff Building. He described their behavior as "unreasonable," in that they had interfered with the

6

"normal activities going on," and it took considerable force – by three FPS employees – to open the employee doors blocked by Williams and Scruggs. Defendant Scruggs testified that the entire event lasted only five to six minutes, which "would not have ruined anyone's day." In that she believed that there are "many, many doors" at the Ribicoff Building (which is not true, as testified to by Amaro), she did not believe that she had endangered the public. She testified that had there been a fire in the building, she "can assure" the Court that she would have moved her body away from the door. In fact, two videos reflect that at one point, defendant Fountain did move slightly away from the public doors in order to permit one person to exit the building. (Exh. 5 (Public Entrance 2, Plaza Right Ext)).

The six videos amply demonstrate that defendants Williams and Scruggs blocked the employee doors from 12:38 p.m. to 12:41 p.m., rendering those doors completely inaccessible during that time period, and that defendants Colville and Fountain blocked the public doors from 12:38 p.m. to 12:52 p.m., as well as the employee doors from 12:54 p.m. to 12:56 p.m. (Exh. 5). The videos confirm that both sets of doors at the front of the building on Main Street were blocked from 12:38 p.m. to 12:41 p.m. (Id.). All six videos confirm that except for the period when the doors were blocked, there was a steady stream of people entering and exiting the Ribicoff Building between 12:26 p.m. and 1:19 p.m. that day, including families with young children, as well as individuals in wheelchairs and ambulating with canes. (Id.). The two videos at the employee doors immediately following the arrests of defendants Williams and Scruggs, once the employee doors were again undisturbed, show a large number of people entering and exiting the building. (Exh. 5

7

(Employee/Public Exit and Employee ID Entrance)).

## II. CONCLUSIONS OF LAW

All four defendants were charged with violation of 41 C.F.R. § 102-74.390.

(Exh. 7).  This section provides in relevant part:

> All persons entering in or on Federal property are prohibited from loitering, exhibiting disorderly conduct or exhibiting other conduct on property that –
>
> . . .
>
> (b) Unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots;
>
> (c) Otherwise impedes or disrupts the performance of official duties by Government employees; or
>
> (d) Prevents the general public from obtaining the administrative services provided on the property in a timely manner.

It is not disputed that the Ribicoff Building is federal property.  This regulation, among others, was at issue in United States v. Brasch, No. 05 CR 865 (PKL), 1996 WL 720090 (S.D.N.Y. Dec. 12, 1996), aff'd, 205 F.3d 1325 (2d Cir. 1999), cert. denied, 530 U.S. 1236 (2000).  In that case, the defendant was standing in line with approximately twenty to thirty other people waiting to be processed by the x-ray machine and magnetometer before entering a federal building; when defendant reached this equipment, he refused to comply with multiple requests from  security officers to place his calculator on the x-ray machine, causing a substantial delay in the process, following which he engaged in a struggle with the guards and was arrested.  1996 WL 720090, at *1-3.  U.S. District Judge Peter Leisure found that the Government had proven beyond reasonable doubt that this conduct constituted "disorderly conduct, or other conduct . . . which unreasonably obstructs the use of

entrances, foyers, lobbies . . .; . . . or which prevents the general public from gaining entrance to the property in a timely fashion." Id. at *4 (internal quotations omitted).

The facts here are even stronger than those in Brasch, especially because there is no dispute that the four defendants sat down in front of all the doors of the Ribicoff Building that face Main Street. While there is not as precise a number, as in Brasch, regarding the people inconvenienced by these defendants, the defendants themselves agree that there were some federal employees and some members of the public who were not allowed to enter the Ribicoff Building as a result of defendants' actions. Although most of these individuals seemed to take this disruption in stride, even defendant Colville acknowledged that at least one person was "visibly frustrated," so that Colville offered to let him through. Upon cross-examination, Colville also acknowledged that he did not know the number of people inside the Ribicoff Building who were unable to exit. The timing of this event was particularly disruptive, since it occurred between 12:38 and 12:56 p.m., a customary lunch hour for some of the federal employees who work inside the Ribicoff Building, who wanted to exit or re-enter the building, or for members of the public, who might have needed to complete a task within the building during their lunch break elsewhere. As all six videos confirmed, except for the period when the doors were blocked, there was a large number of people who entered and exited the Ribicoff Building, in the fifty-five minutes between 12:26 p.m. and 1:19 p.m., and some of these individuals were families with young children, as well as people in wheelchairs and ambulating with canes. Of particular importance are the videos at the employee doors immediately following the arrests of defendants Williams and Scruggs, once the employee doors

9

were again unobstructed, where a considerable number of people can be seen entering and exiting the building. (Exh. 5 (Employee/Public Exit and Employee ID Entrance)).

Most significantly, both sets of doors are used as exit doors, and notably, are used as emergency doors.  It is of no moment that defendant Scruggs testified that she would have moved her body if there was a fire in the building.  In these uncertain times, particularly given the events in Sandy Hook, Boston, and most recently the Navy Yard in Washington, D.C., there is little doubt that having four adults sitting in front of, or firmly against, the only exit doors in the front of a massive federal building presents a serious risk to the safety of the occupants of the building, when seconds may count in escaping from danger, especially when, as the videos demonstrate, some of the visitors were young children, or people in wheelchairs or ambulating with canes. No matter how well-meaning and well-intended defendants may have been, their actions that day placed the safety of all of these individuals in jeopardy.

Therefore, the Government has proven beyond reasonable doubt that defendants violated 41 C.F.R. § 102-74.390(b) & (d), by "[u]nreasonably obstruct[ing] the usual use of entrances, foyers, [and] lobbies . . ." and by "[p]reventing the general public from obtaining the administrative services provided on the property in a timely manner."[2] The four defendants thus are found guilty.

Pursuant to FED. R. CRIM. P. 58(c)(3), sentencing is scheduled for **October 30, 2013, at 3:00 p.m.**, in 141 Church Street, Courtroom 5, New Haven, Connecticut.

---

[2]Given this conclusion, the Court need not determine whether defendants also have violated § 102-74.390(c).

If the Assistant U.S. Attorney or defendants wish to submit additional information,

they may do so **on or before October 25, 2013**.

Dated at New Haven, Connecticut, this 18th day of October, 2013.

_/s/ Joan G. Margolis, USMJ_
Joan G. Margolis
U.S. Magistrate Judge

11